**STATE OF MARYLAND, Plaintiff,**
and
State of Colorado et al., Intervening
Plaintiffs,

v.

W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor

and

Clarence T. Lundquist, Administrator of
the Wage and Hour and Public Con-
tracts Division of the United States De-
partment of Labor,

and

William Hargadine, Jr., Regional Direc-
tor, Third Region, Wage and Hour and
Public Contracts Division, United States
Department of Labor, Defendants.

Civ. A. No. 18005.

United States District Court
D. Maryland.

June 13, 1967.

Francis B. Burch, Atty. Gen. of Maryland, Alan M. Wilner and Franklin Goldstein, Asst. Attys. Gen. of Maryland (Robert F. Sweeney, Deputy Atty. Gen. of Maryland, and Loring E. Hawes, Asst. Atty. Gen. of Maryland, on brief), A. J. Carubbi, Hawthorne Phillips and Robert W. Norris, Asst. Attys. Gen. of Texas (Crawford C. Martin, Atty. Gen. of Texas, and Cecil A. Morgan, Fort Worth, Tex., for Ft. Worth Independent School District, on brief), William M. Hoiles, Asst. Atty. Gen. of Ohio, G. T. Blakenship, Atty. Gen. of Oklahoma, James Noble, Atty. Gen. of New Mexico, for plaintiffs.

Charles Donahue, Sol. of Labor, Thomas J. Kenney, U. S. Atty., Dist. of Maryland, James M. Miller, Deputy Associate Sol., Dept. of Labor (Barefoot Sanders, Asst. U. S. Atty. Gen., Harland F. Leathers, William A. Gershuny, Attys., Dept. of Justice, Bessie Margolin, Associate Sol., Dept. of Labor, Robert E. Nagle and William Fauver, Attys., Dept. of Labor, on brief), for defendants.

J. Albert Woll, Robert C. Mayer, Lawrence Gold and Thomas E. Harris, Washington, D. C., on brief for American Federation of Labor and Congress of Industrial Organizations, amici curiae.

Henry Kaiser, Ronald Rosenberg and Van Arken & Kaiser, Washington, D. C., on brief for American Federation of State, County and Municipal Employees, AFL–CIO, amicus curiae.* ·

Before WINTER, Circuit · Judge, THOMSEN, Chief Judge, and NORTHROP, District Judge.

WINTER, Circuit Judge:

This is an action brought by the State of Maryland, in which twenty-five other States have intervened as parties plaintiff, asking the Court to declare unconstitutional the 1966 Amendments to the Fair Labor Standards Act[1] (the "1966 Amendments") insofar as they apply to employees of the plaintiff States, and to enjoin enforcement of the Act, as amended, against the States. Although the 1966 Amendments extend the Act's coverage to employees of enterprises, whether public or private, engaged in the operation of schools, hospitals and related institutions, street, suburban or interurban electric railways, and local trolley and motorbus carriers, the States, in briefs and oral argument, challenge application of the Act only to public schools, hospitals and related institutions; and this Court will limit its consideration accordingly.

Defendants have filed a motion to dismiss or, in the alternative, a motion for summary judgment. Plaintiffs have filed cross-motions for summary judgment. The parties have entered into extensive stipulations of fact with regard to Maryland, Texas and Ohio. It is agreed that these data may be taken as representative of the situation in the other plaintiff States. Some objections to relevancy and materiality have been raised, but the Court is satisfied that the conclusions reached herein would not be

* Only counsel who participated in the hearing on the merits and who filed briefs are thus listed. Appearances for the intervening States were entered by their Attorneys General and one or more Assistant Attorneys General.

1. Public Law, 89–601, 80 Stat. 830, amending the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

affected by the exclusion of any of the stipulated evidence.

## INTRODUCTION

The Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., was first enacted in 1938 as a result of Congressional findings, recited in § 2(a) of the Act, 29 U.S.C.A. § 202, that:

"the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce."

It was therefore declared to be the policy of Congress, through the exercise of its power to regulate commerce among the several States "to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power." 29 U.S.C.A. § 202(b). Congress accordingly provided that employers must pay those employees who were "engaged in commerce or in the production of goods for commerce" a minimum hourly wage, 29 U.S.C.A. § 206(a), and one and one-half times their regular hourly rate for weekly hours over a specified maximum, 29 U.S.C.A. § 207(a) (1). States and their political subdivisions were excluded from the Act's definition of "Employer." 29 U.S.C.A. § 203(d).

The constitutionality of the original Act was sustained in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The Court stated, inter alia, that the power of Congress over commerce "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." Id., at p. 118, 61 S.Ct., at p. 459.[2]

The Act has been amended several times,[3] but until the 1966 Amendments state employees were not brought within its coverage.

In 1961 the "enterprise" concept was introduced. 29 U.S.C.A. § 203(r), 75 Stat. 65. In addition to employees previously covered—those personally engaged in interstate commerce or in the production of goods for commerce—the Act was extended to cover "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including

---

2. Subsequent decisions have pointed out that "Congress did not exercise in this Act the full scope of the commerce power," but rather chose "to regulate only part of what it constitutionally can regulate." Walling v. Jacksonville Paper Co., 317 U.S. 564, 570–571, 63 S.Ct. 332, 336, 87 L.Ed. 460 (1943); Kirschbaum Co. v. Walling, 316 U.S. 517, 521–522, 62 S.Ct. 1116, 1119, 86 L.Ed. 1638 (1942). See also, Overstreet v. North Shore Corp., 318 U.S. 125, 128, 63 S.Ct. 494, 87 L.Ed. 656 (1943); Higgins v. Carr Bros. Co., 317 U.S. 572, 574, 63

S.Ct. 337, 87 L.Ed. 468 (1943); Mitchell v. H. B. Zachry Co., 362 U.S. 310, 313, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960).

3. The principal amendatory enactments have been the Portal-to-Portal Act of 1947 (61 Stat. 84), the Fair Labor Standards Amendments of 1949 (63 Stat. 910), the Fair Labor Standards Amendments of 1955 (69 Stat. 711), the Fair Labor Standards Amendments of 1961 (75 Stat. 65), the Equal Pay Act of 1963 (77 Stat. 56), and the Fair Labor Standards Amendments of 1966 (80 Stat. 830).

departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor." An "enterprise engaged in commerce or in the production of goods for commerce," and therefore covered by the Act, was defined in terms of a minimum annual dollar volume of gross sales and, in some instances, the particular type of business involved. See 29 U.S.C.A. § 203(r) and (s). The validity and scope of the enterprise concept has not yet been decided by the Supreme Court.

The 1966 Amendments extended the enterprise basis of coverage and brought within the Act public as well as private enterprises engaged in operating schools, hospitals and related institutions, street, suburban or interurban electric railways, and local trolley or motorbus carriers.[4] The definition of "Employer" in 29 U.S. C.A. § 203(d) was amended to eliminate the existing exclusion of States and their

political subdivisions insofar as they engaged in those activities. In fitting employees first covered by the 1966 Amendments into the minimum wage and maximum hour scale of employees theretofore covered, the 1966 Amendments provide for an escalation of the minimum wage and of maximum hours over a period of five years.[5]

The 1966 Amendments, which thus had the effect of extending the minimum wage and overtime provisions of the Fair Labor Standards Act to a *portion* of the labor market not theretofore covered,[6] are attacked insofar as they extend coverage to certain employees of public schools, hospitals and related institutions. Despite the impression sought to be created by several of the plaintiff States, extension of the Act to certain groups of state employees was not a concept first advanced in the Second Session of the 89th Congress under circumstances which would have prevented the States from presenting their views in opposition to the proposal, had they sought to keep

---

4. In addition to amending the Act's definition of "employer" (see text, infra), other pertinent changes, effected by the 1966 Amendments were: an existing exemption for hospitals and certain related institutions and schools for handicapped or gifted children, formerly contained in § 13(a) (2) (iii), was eliminated, and such institutions and schools, as well as elementary and secondary schools and institutions of higher learning, were designated in § 3(s) (4) as types of enterprises whose coverage would not depend on an annual gross volume test; the existing annual gross volume test for local transit enterprises (in former § 3(s) (2)) was lowered from $1 million to $500,000 until Feb. 1, 1969 and to $250,000 thereafter (§ 3(s) (1)); and the definition of "enterprise" in § 3(r) was amended to provide that local transit operations, the above described schools and hospitals and related institutions, whether public or private or for profit or not for profit, would be regarded as operated for a "business" purpose.

5. Thus, while the minimum wage for employees theretofore covered by the Act is $1.40 per hour, for the first year after February 1, 1967, and $1.60 per hour thereafter, minimum wages for employees newly covered are $1.00 per hour, for

the first year and increase 15¢ per year for each year thereafter until the level of $1.60 is reached. Similarly, overtime must be paid to employees theretofore covered who work in excess of 40 hours per week, while overtime must be paid to newly covered employees who work more than 44 hours the first year, 42 hours the second year, and 40 hours each year thereafter, respectively, after February 1, 1967.

6. While the 1966 Amendments to the Fair Labor Standards Act, *inter alia*, extend the Act's coverage to employees of schools, hospitals and related institutions, electric railways, trolley and motorbus systems, *whether public or private*, not every employee of such enterprise is made subject to the Act. Section 13 of the Act, 29 U.S.C.A. § 213, as it existed prior to the effective date of the 1966 Amendments, and as amended by the 1966 Amendments, exempts certain classes of employees. For our purposes, the significant exemption is that of a person "employed in a bona fide executive, administrative or professional capacity (including any employee employed in the capacity of academic, administrative personnel or teacher in elementary or secondary schools * * *)."

abreast of matters under consideration by Congress.

The first legislative effort to extend coverage to some state employees occurred in the First Session of the 89th Congress.[7] During the Second Session of the 89th Congress, when H.R. 13712, which, as amended, was enacted as the 1966 Amendments, was introduced into the House of Representatives, it contained language which would have extended coverage (subject to the exemptions in § 13)[8] to any person "in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally handicapped or gifted children, or an institution of higher education (*regardless of whether or not such hospital, institution or school is public or private or operated for profit or not for profit*) \* \*."[9] (emphasis supplied) During legislative consideration of the bill, the only variation as to the extent of coverage, pertinent to this law suit, was whether public or private school employees covered should be limited to those employed by "an institution of higher education" or whether they should include persons employed by "an elementary or secondary school."[10] The question was resolved by

7. During the 89th Congress, 1st Session, H.R. 8259, was introduced in response to a special message of President Johnson urging, *inter alia*, extension of the Fair Labor Standards Act to an additional 4½ million workers. H.R. 8260, introduced by Mr. Roosevelt, also would have extended coverage of the Act. Neither bill purported to be applicable to state employees. While hearings on both bills were being conducted by the House Committee on Education and Labor, to which they had been referred, Mr. Roosevelt introduced another bill, H.R. 10518. This new bill extended coverage to certain employees of public and private hospitals and institutions of higher education regardless of whether public or private, profit or non-profit. H.R. 10518 was referred to the Committee on Education and Labor which, on August 25, 1965, reported the bill favorably, without amendment, and recommended that it be passed. House Rpt. No. 871, 89th Cong., 1st Sess. H.R. 10518 was then committed to the Committee of the Whole House on the State of the Union and no further action was taken thereon. Cong. Quart. Almanac, 1965, Vol. 21, p. 861.

8. See, n. 6, supra.

9. The bill as originally introduced would have also extended coverage to employees of a "street, suburban or interurban electric railway, or local trolley or motorbus carrier, if the rates and services of such railway or carrier are subject to regulation by a State or local agency (*regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit*) \* \* \*." (emphasis supplied)

10. As introduced, the bill did not apply to employees of elementary and secondary schools, although it did apply to employees of institutions of higher learning, whether public or private. After the House Education and Labor Committee reported the bill favorably, with amendments, the House resolved itself into the Committee of the Whole House on the State of the Union. At this point in the legislative process, Mr. Collier, of Illinois, offered an amendment to extend coverage to employees of elementary and secondary schools. The amendment was adopted and the bill passed the House as so amended. He made the following statement about the rationale of his amendment, viz.,

"MR. COLLIER: Mr. Chairman, these amendments are simple and sound and essential amendments. I do not believe that any Member of this body who believes in the principle and purpose of the bill before us today can oppose them.

"What we have done here, if Members will review with me the language of the definition of 'enterprise,' is to say that in sum and substance the employee who works as a dishwasher in a home for the sick or the aged or mentally ill, or one who works as a dishwasher in a college or university cafeteria, or one who works as a dishwasher, for example, in a mental institution, is covered under this bill. Yet, the same employee working as a dishwasher in an elementary or high school cafeteria is not covered.

"*All I want to do is to establish equity in application of the bill.* Let me tell why. I believe I can best explain it by giving an example. This is an actual case.

extending coverage to employees of elementary and secondary schools, as well as institutions of higher learning, subject, again, to the exemptions contained in § 13 of the Act, as also amended by the 1966 Amendments.

The plaintiff States attack the constitutionality of the 1966 Amendments on the ground that the activities of the States and various school districts in the operation of schools, hospitals and related institutions are not commerce,[11] that the "enterprise" concept embodied in the Act by amendments adopted in 1961 is unconstitutional, and that the 1966 Amendments unconstitutionally impugn state sovereignty.[12]

"In a suburban area of one of our southern States, school officials were recently notified that poverty funds were available to hire students who qualified under the poverty family income level at $1.25 per hour. What happened was this: The same school had working in the cafeteria women who had been employed for years—in fact, one was a widow—drawing 85 cents an hour for working in the school cafeteria. Yet, children were handpicked and given $1.25 an hour to wash the blackboards in the same school.

"I do not believe there is anyone sitting in this House today who can justify this type of situation realizing, as we all must, that there will be under the poverty program a $1.25 hourly wage level. If not, then I would have grave reservation as to the depth of the sincerity such a Member would have in the principle of minimum wage.

"MR. PUCINSKI: Mr. Chairman, will the gentleman yield?

"MR. COLLIER: I yield to the gentleman from Illinois.

"MR. PUCINSKI: Mr. Chairman, if I understand this amendment correctly, it will establish a different fair labor standard provision for people presently employed in elementary and secondary schools and universities.

"MR. COLLIER: That is exactly correct. *I do not want any inequities such as we have been talking about today. We are moving to achieve equity which means treating everyone alike.*" (emphasis supplied) 112 Congressional Record (May 25, 1966), pp. 10820–10821.

The Senate Committee on Labor and Public Welfare reported the bill favorably, with an amendment to *exclude* employees of elementary and secondary schools, and this amendment was adopted. Senate Report No. 1487, August 23, 1966, 2 U.S.C. Congressional and Administrative News (89th Congress—Second Session, 1966), p. 3002. The Senate Committee, however, did not undertake to exclude any other public employees from coverage under the Act. The excluded coverage was subsequently restored by the Conference Committee appointed to iron out differences between the House and Senate versions of the legislation. Conference Report No. 2004, September 6, 1966, 2 U.S.C. Congressional and Administrative News, supra, p. 3047. It was with an extension of coverage to employees of elementary and secondary schools that H.R. 13712 was finally enacted and signed into law.

11. Texas words this point as follows: "A state in the performance of the functions of its sovereignty is not engaged in commerce within the meaning of the commerce clause of the constitution of the United States."

12. Maryland also advances an argument based upon the Eleventh Amendment and its asserted conflict with the provision of the Fair Labor Standards Act which permits an employee not paid in accordance with the minimum wage or overtime provisions of the Act to bring suit if such suit is not brought by the Secretary. 29 U.S.C.A. § 216. This argument is beyond the scope of this consolidated proceeding and will not be further considered at this time. It may be made if and when some State employee finally attempts to sue his employer. Of course, when the argument is advanced and if it is found valid, due regard will be given to the other enforcement provisions contained in 29 U.S.C.A. § 216 and the separability language in 29 U.S.C.A. § 219.

Maryland and Texas also argue that their schools and hospitals are the "ultimate consumers" of commodities purchased from out-of-state, that such commodities are not "goods" as defined by 29 U.S.C.A. § 203(i) and, as a consequence, the Fair Labor Standards Act is not applicable to them. This argument is one of statutory construction, not of constitutional significance, and is also one beyond the scope of this proceeding. It should be asserted in a suit in which the application of the Act to a particular school or hospital is brought into question, so that after full development of the facts, it may be determined if that particular enterprise meets the statutory tests for coverage.

I conclude, for the reasons hereafter stated, that all three of these contentions should be resolved against the plaintiffs, that to the extent of the scope of this proceeding the 1966 Amendments should be declared valid and constitutional, and that injunctive relief should be denied.

### COMMERCE POWER

Maryland and Texas argue that the activities of a State do not constitute "commerce" which may be regulated under the exclusive power vested in Congress to regulate interstate and foreign commerce. Maryland argues more specifically that, with respect to the operation of public schools, the State's activity has three attributes which remove it from any legitimate definition of commerce, i. e., the activity is non-profit, it is purely governmental, and there is no non-governmental system to compete with or substitute for it.

■ At the outset, it is well to note that these arguments are based upon a more restrictive premise than the decided cases will support. United States v. Darby, supra, upholding the constitutionality of the Fair Labor Standards Act generally, is only one of many decisions which holds that the power of Congress over interstate commerce includes not only that which in itself is interstate commerce but also "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it, as to make the regulation of them appropriate means to the attainment of a legitimate end." Id., 312 U.S. at p. 118, 61 S.Ct. at p. 459. See also, United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 300–301, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Among the decided cases, the most extreme example of the reach of the commerce power of Congress to regulate local activity is Wickard v.

Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), where a farmer's consumption of wheat raised on his own farm was held within the reach of Congress to regulate under the commerce clause because that consumption, and its counterpart on other farms, exerted a substantial economic effect on interstate commerce. Accord: United States v. Ohio, 385 U.S. 9, 87 S.Ct. 66, 17 L.Ed.2d 8 (1966)

Thus, the proper inquiry is not limited to a consideration of whether the activities of the States in operating public schools, schools of higher education or hospitals, are "commerce" as such. The proper inquiry is much broader. It is whether such activities are commerce or affect commerce, even though local in nature, and hence within the power of Congress to regulate commerce.

■ Maryland's claims that public schools are non-profit, purely governmental and not in direct competition with non-governmental systems are not shibboleths to determine what is and what is not commerce. "Commerce" is not confined to "business" activity in a conventional sense; it includes non-business and non-profit activities, whether private or governmental in nature and irrespective of whether they compete with or may be substituted for by private enterprise. Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950); Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); United States v. Ohio, 385 U.S. 9, 87 S.Ct. 66, 17 L.Ed.2d 8 (1966); Wirtz v. R. E. Lee Electric Company, 339 F.2d 686 (4 Cir. 1964); Mitchell v. Owen, 292 F.2d 71 (6 Cir. 1961); Goldberg v. Nolla, Galib & Cia., 291 F.2d 371 (1 Cir. 1961), cert. den. Five Boro Construction Corp. v. Goldberg, 368 U.S. 900, 82 S.Ct. 179, 7 L.Ed. 2d 95 (1961); N. L. R. B. v. Central Dispensary & Emergency Hospital, 79 U.S.App.D.C. 274, 145 F.2d 852 (1945), cert. den., 324 U.S. 847, 65 S.Ct. 684, 89

L.Ed. 1408 (1945).[13] In Public Building Authority of City of Birmingham v. Goldberg, 298 F.2d 367, 370 (5 Cir. 1962), the Court, in holding that federal employees engaged in processing claims for the payment of social security benefits and preparing government checks for beneficiaries were producing goods for commerce, summarized prior holdings by declaring that "there need be no private parties or profit motive present to constitute commerce." It will be noted that this was said in a case in which all of the factors urged by Maryland to render her activities not within the commerce power of Congress were present: the activity was governmental, non-profit, and could not be performed by private enterprise.

■ The fact is that under the stipulations before us there is abundant evidence that the States, in the performance of the functions where certain employees are covered by the Act, as amended by the 1966 Amendments, are not only engaging in commerce, or in the production of goods for commerce, but are engaging in activities, local in nature, which have a substantial effect on commerce. A brief recital of some of the stipulations between the parties is sufficient to demonstrate.

In the current fiscal year an estimated $38.3 billion will be spent by State and local public educational institutions in the United States. In the fiscal year 1965, these same authorities spent $3.9 billion operating public hospitals. Expenditures of this magnitude are bound to have an enormous impact on interstate commerce.

For Maryland, which was stipulated to be typical of the plaintiff States, 87% of the $8 million spent for supplies and equipment by its public school system during the fiscal year 1965 represented direct interstate purchases. Over 55% of the $576,000 spent for drugs, x-ray supplies and equipment and hospital beds by the University of Maryland Hospital and seven other state hospitals were out-of-state purchases. With respect to seven other state hospitals which spent $875,000 on such items during the comparable period, the parties have stipulated that all or "the most part" of such items were manufactured outside of Maryland.

In Ohio, also stipulated to be typical of all of the plaintiff States, there are 708 school districts, 3 of which (stipulated to be typical of the other school districts) purchased a total of $323,000 in supplies in the fiscal year 1966. Approximately 50% of these purchases were directly from outside of the state. Ohio's six state universities spent $9 million on certain specified supplies in that year, over 42% of which were purchased directly from out-of-state, with an undetermined portion of the remainder being manufactured outside the state.

In Texas, all text books originate outside the state, and it is stipulated that "the major portion" of drugs and hospital equipment is either purchased directly from out of the state or is at least manufactured in other states.

13. Pertinent also are the following authorities which have held to be "commerce," *non-commercial* interstate transportation of persons and chattels; Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (movement of indigent persons across state lines); Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013 (1926) (diseased cattle ranging across state lines); Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (transportation of women across state lines for non-commercial immoral purposes); Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699 (1925) (transportation of stolen articles); United States v. Hill, 248 U.S. 420, 39 S.Ct. 143, 63 L.Ed. 337 (1919) (transportation of liquor for one's own consumption). As a latest expression of the state of the law, Heart of Atlanta Motel, Inc. v. United States, supra, 379 U.S. at pp. 256–257, 85 S.Ct. at p. 357, declares: "Nor does it make any difference whether the transportation is commercial in character."

The interstate flow of school and hospital supplies and equipment is, in large part, inevitable because of the nondiffusion of manufacturing supplies. For example, there are no Maryland suppliers for fourteen out of eighteen major categories of school supplies and equipment. Even larger States, such as Ohio and Texas, have no producers, or very few producers, of text books, science equipment and physical education equipment.

Not only do public schools and hospitals give rise to a large interstate flow of supplies and equipment, having a correspondingly substantial effect upon interstate commerce, public schools and hospitals are directly engaged in commerce and the production of goods for commerce by virtue of federal aid to education and health, involving billions of dollars. Over $4 billion is spent each year in federal grants, of which over $2 billion goes for elementary and secondary public education, 50% of which is granted directly to local school districts under programs requiring extensive communications between local schools and regional and national facilities of the United States Office of Education. In the area of health services, federal expenditures during fiscal year 1965 amounted to $5 billion, while State and local government expenditures amounted to $4.9 billion. Included in the total of federal expenditures, are annual federal assistance of $260 million for the construction and enlargement of hospitals and other health facilities, annual medical research grants of over $600 million, and public health grants of $65 million to support State and local health agencies, both in operating costs and in programs for the control of disease. Additionally, the Social Security Administration during fiscal 1967 will pay out $2.35 billion for hospital services under the Medicare program, in which 94% of the hospitals in the country, both public and private, currently participate. Another $1 billion will be spent for direct reimbursement to hospitals and physicians for services to eligible patients. These programs create a regular interstate flow of funds to par-

ticipating hospitals, extensive interstate communication and preparation of materials for interstate transmission by both local hospitals and state agencies, including engineering and architectural plans for hospital construction and enlargement, research data and reports, medical benefits claims, and numerous other types of reports and records.

"Ideas, wishes, orders and intelligence" are "subjects of commerce," Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 502–503, 65 S.Ct. 335, 89 L.Ed. 414 (1945), and the preparation of written documents and other materials for out-of-state transmission, as well as the actual interstate transmission of funds, documents and other communications, are all activities in commerce. Beneficial Finance Co. of Wisconsin v. Wirtz, 346 F.2d 340 (7 Cir. 1965); Willmark Service System, Inc. v. Wirtz, 317 F.2d 486 (8 Cir. 1963), cert. den., 375 U.S. 897, 84 S.Ct. 170, 11 L.Ed.2d 125 (1963); Public Building Authority of City of Birmingham v. Goldberg, 298 F.2d 367 (5 Cir. 1962); Mitchell v. Kroger Company, 248 F.2d 935 (8 Cir. 1957); Aetna Finance Co. v. Mitchell, 247 F.2d 190 (1 Cir. 1957). Thus, from these activities, as well as the out-of-state purchases and the receipt of interstate shipments which are either stipulated or inescapably must be inferred from the facts stated, the conclusion is inevitable that the activities of the states are *"in"* commerce, constitute the production of goods for commerce, or substantially affect commerce, although local in nature. Leaving aside for the moment the question of state sovereignty, I conclude that these activities are clearly within the power of Congress to regulate commerce.

## THE ENTERPRISE CONCEPT

█ The only authorities to pass on the constitutionality of the enterprise concept, Wirtz v. Edisto Farms Dairy, 242 F.Supp. 1 (D.S.C.1965), and Goldberg v. Ed's Shopworth Supermarket, 214 F.Supp. 781 (W.D.La.1963), have both sustained its validity. From my examination of the pertinent authorities, I am

in accord with the result reached in those decisions and conclude that the enterprise concept embodied in the Fair Labor Standards Act in 1961, 29 U.S.C.A. § 203(r), represents a constitutionally valid exercise of the power of Congress to regulate commerce.

As I have recited, prior to 1961 the Fair Labor Standards Act applied only to those employees who themselves engaged in commerce or in the production of goods for commerce. By the provisions of the 1961 Amendments, *all* employees of various enterprises whose activities related to the movement of goods in commerce, including those engaged in selling, distributing or using goods that had previously moved in commerce became subject to the Act, subject of course, to the exemptions contained in § 13 of the Act, 29 U.S.C.A. § 213.[14]

Translated into a concrete example, the enterprise concept, as amended by the 1966 Amendments, means that in a private or public hospital the nurse's aid or maintenance worker, even though not engaged in commerce or in the production of goods for commerce, is subject to the minimum wage and overtime provisions of the Act if some employee of the hospital is engaged in commerce or in the production of goods for commerce, or handling goods in commerce. That Congress may constitutionally so extend coverage seems clear from the decided cases, of which Congress was fully aware when it first adopted the enterprise concept in 1961.[15] Indeed, it may properly

be concluded that in adopting the enterprise concept Congress did not exercise to the limit its full power to regulate commerce, because application of the enterprise concept is conditioned upon the presence of some employee directly engaging in commerce, producing goods for commerce or handling goods in commerce. From the authorities it may be concluded that the enterprise concept could have been conditioned upon some employee engaging in local activity "affecting commerce" short of the actual interstate activity previously mentioned.[16]

One of the leading authorities pointing to the conclusions just stated is National Labor Relations Board v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), in which the National Labor Relations Board's jurisdiction over unfair labor practices committed by a retail distributor of fuel oil, all of whose sales were local, where the retailer obtained the oil from a wholesaler who imported it from another state, was upheld. The conclusion resulted from the Court's construction of the National Labor Relations Act to vest in the Board " * * * the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause" (Id., at p. 226, 83 S.Ct. at p. 313), and the citation of Wickard v. Filburn, supra, to support the conclusion that the distributor's activities affected commerce and were within the constitutional reach of Congress to regulate. Reference was also made to Polish National Alliance, etc. v.

---

14. The 1961 extension of the Act's coverage had the effect of adding over four million workers to the twenty-four million previously within the Act's protection. This extension of coverage was the result of deliberate and lengthy consideration by at least two Congresses. (Senate Report No. 145, 87th Congress First Session, pp. 2, 10; House Report No. 75, 87th Congress, First Session, pp. 2, 7). Exercise of the power to extend coverage was based upon the conclusion, discussed in detail in the Committee Reports of both the Senate and the House, that the additional coverage was necessary to accomplish the Act's original purposes and was within the scope of the

federal commerce power as evidenced by existing precedents under the National Labor Relations Act and other regulatory statutes.

15. See e. g., Senate Report No. 145, April 10, 1961, 87th Congress, First Session, 2 U.S.C.Cong. and Adm.News (87th Cong., 1st Sess., 1961), pp. 1622–1623.

16. In this regard, the authorities cited in footnote 2. supra, all of which were decided prior to the 1961 Amendments are pertinent. They clearly indicate that prior to 1961, there were interstices in the Act which Congress could constitutionally fill. As pointed out in the text, they were only partially filled in 1961.

N. L. R. B., 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944), for the proposition that in enacting the National Labor Relations Act " * * * Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce." Id., at p. 648, 64 S.Ct. at p. 1199.

Similarly, in N. L. R. B. v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) ; Building Trades Council v. Kinard Constr. Co., 346 U.S. 933, 74 S.Ct. 373, 98 L.Ed. 423 (1954) ; and Plumbers, etc., Local 298, A. F. of L. v. Door County, 359 U.S. 354, 79 S.Ct. 844, 3 L.Ed.2d 872 (1959), the use of materials from out-of-state provided the basis for National Labor Relations Board jurisdiction with respect to the construction, respectively, of an office building, a court house and a housing project. See also, San Diego Building Trades Council v. Garmon, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957) ; Amalgamated Meat Cutters, etc., Local No. 427, AFL v. Fairlawn Meats, Inc., 353 U.S. 20, 77 S.Ct. 604 (1957). See also, Howell Chevrolet Co. v. N. L. R. B., 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953).

If the National Labor Relations Board may regulate the acts of the employer toward each employee of the fuel oil retail distributor and every construction worker on a building project without regard to whether that employee is directly engaged in interstate commerce simply because some goods are bought by the company out-of-state, it cannot be doubted that the nurse's aid or hospital maintenance worker likewise may be brought under the coverage of the Fair Labor Standards Act when someone employed by the hospital purchases drugs and equipment out-of-state, or purchases from local sources drugs and equipment which were produced out-of-state, or handles drugs and equipment originating from out-of-state, or the hospital engages in commerce in administering and carrying out a federal health grant or the program of Medicare, even though the nurse's aid or maintenance worker himself does not carry on such activities. The same is true in regard to employees of schools, elementary, secondary, or institutions of higher learning, and specialized hospitals engaged in treatment of the mentally ill, those suffering from contagious diseases, the aged, or the handicapped.

It is a matter of elementary logic that the hospital and the school function as a result of the sum of all of the activities of all of their employees. The hospital administrator or the superintendent of education (himself exempt from the provisions of the Act), or his secretary, or some other employees, would have no occasion to engage in commerce, or the production of goods in commerce, if the services of the employees covered by the Act under the 1966 Amendments were permanently withdrawn. Their services are essential to the operation of the hospital or the school and, hence, their activities, although local in nature, substantially affect commerce, so that Congress may regulate the minimum wages to be paid them as well as the maximum hours they may be required to work without payment of overtime.

### STATE SOVEREIGNTY

■ The precise claim of unconstitutional interference with state sovereignty made in this case has not been adjudicated by any court, because Congress has not heretofore attempted to regulate minimum wages and maximum hours (without overtime) for state employees. But from what has been decided in numerous other contexts analogous to the case at bar, and from the basis of those decisions, I can only conclude that the 1966 Amendments are valid and constitutional in their entirety. I have already referred to the cases in which the full extent of the power of Congress generally to regulate commerce has been developed. In every instance in which the exercise of this power has

been applied to some state activity, the validity of the exercise has been upheld in language and on reasoning which, I am satisfied, sustains the validity of the 1966 Amendments. Because it is on this aspect of the case that the States most vigorously attack the validity of the 1966 Amendments, I am constrained to discuss these authorities fully.

Since the States are most vociferous in conjuring up the possible "horribles" of an adverse adjudication to them,[17] it is necessary, at the outset, to define what is—and what is not—presently before us. Before me is only the question of whether Congress may prescribe minimum wages and overtime for non-executive, non-professional and non-administrative employees of private and public hospitals, schools and related institutions. Congress has singled out this group which, experience has proved, is often underpaid and subjected to unreasonable work schedules and has required that its members be paid a minimum sum which, measured by the standards of contemporary society, is deemed a decent wage and that they not be compelled to work longer hours in a work period without payment of overtime than, by those standards, are deemed proper. These standards have been made applicable to private and public employees, alike. Congress has *not* sought to cover doctors, nurses, principals, teachers, research assistants, or the like. Nor has Congress sought to cover the governors, attorneys general, legislators, judges or policemen, who, some of the States assert, could eventually be covered if we upheld the validity of the 1966 Amendments.

Our consideration of the constitutional issue presented here cannot deal with hypothetical projections by the States of regulations yet to come. Our consideration of the States' contention that their sovereignty is impaired, and my conclusion that the 1966 Amendments are valid and constitutional, are limited to the 1966 Amendments and only those employees to which they extend, as are my previous conclusions that the power to regulate under the commerce clause exists and that the enterprise concept is constitutional. No court, and in particular no lower federal court, should attempt to adjudicate that which is not justiciable; all must steadfastly follow the rules set down by the Supreme Court governing the process of constitutional adjudication:

"The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly before them. This was made patent in the first case here exercising that power—'the gravest and most delicate duty that this Court is called on to perform.' Marbury v. Madison (US) 1 Cranch 137, 177–180, 2 L.Ed. 60, 73, 74. *This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.* In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' \* \* \* Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. \* \* \* In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, this Court developed various reasons for this

17. See New York v. United States, 326 U.S. 572, 583–584, 66 S.Ct. 310, 90 L.Ed. 326 (1946).

rule. Very significant is the incontrovertible proposition that it 'would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.' Id., 346 U.S. at page 256, 73 S.Ct. at page 1035. *The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.*" (emphasis supplied; footnote eliminated) United States v. Raines, 362 U.S. 17, 20–22, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).[18]

As a first step in the decision of the limited question before me, it is necessary to put to rest any argument based upon the Tenth Amendment, as such. The Tenth Amendment is but a "truism" —"that all is retained which has not been surrendered." United States v. Darby, supra, 312 U.S. at p. 124, 61 S.Ct. at p. 462. Besides stating this self-executing formula, the decided cases are clear that the Tenth Amendment neither adds to nor detracts from the essential question to be decided in this case. United States v. Sprague, 282 U.S. 716, 733–734, 51 S.Ct. 220, 75 L.Ed. 640 (1931); United States v. Appalachian Electric Power Company, 311 U.S. 377, 428, 61 S.Ct. 291, 85 L.Ed. 243 (1940); State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 534, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); Fernandez v. Wiener, 326 U.S. 340, 362, 66 S.Ct. 178, 90 L.Ed. 116 (1945); Case v. Bowles, 327 U.S. 92, 101–103, 66 S.Ct. 438, 90 L.Ed. 552

(1946); United States v. Oregon, 366 U.S. 643, 649, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961).

I turn directly to the cases where federal regulation under the Commerce Clause has been upheld, even when applied to an "essential" state activity. The principal authorities which must be considered are Sanitary District of Chicago v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925); Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933); Case v. Bowles, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946); and the four related cases of United States v. State of California, 297 U.S. 175, 56 S.Ct, 421, 80 L.Ed. 567 (1936); State of California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944); State of California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957); and Parden v. Terminal Ry. of Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Also of interest, because it posed an issue of state sovereignty dispositive of this litigation, is United States v. Ohio, 385 U.S. 9, 87 S.Ct. 66, 17 L.Ed.2d 8 (1966).

The oldest and one of the most important cases is the *Sanitary District* case. This was a suit by the Attorney General of the United States to enjoin the Sanitary District of Chicago from diverting a volume of water from Lake Michigan in excess of that allowed by federal statute, although a state statute set a higher limit. The federal government asserted the taking to conflict with the power of Congress to regulate inter-

---

18. Although one of the best expressions of judicial self-restraint in the process of constitutional adjudication, United States v. Raines, supra, does not stand alone. It is only one of a line of decisions developing the concept which it so eloquently states: Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911); Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion, Brandeis, J.); Alabama State Federation of Labor, etc. v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L. Ed. 754 (1947); United States v. Spector, 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863 (1952); International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954). Additional authorities are cited in the portion of the opinion in United States v. Raines, supra, from which the quotation is extracted.

state and foreign commerce, and with a treaty with Great Britain concerning boundary waters of the Dominion of Canada; the Sanitary District defended on the grounds, *inter alia*, that public health required the taking of the additional quantity of water in accordance with the state statute, because otherwise it would be impossible to carry the city's sewage downstream.

Mr. Justice Holmes, speaking for a unanimous Court, held that the injunction should issue. He declared, basing the right to relief on the power of the federal government to regulate interstate and foreign commerce:

"The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. *There is no question that this power is superior to that of the states to provide for the welfare or necessities of their inhabitants.* In matters where the States may act the action of Congress overrides what they have done." (emphasis supplied) Id., 266 U.S. at p. 426, 45 S.Ct. at p. 178.

Following this he recited the evidence in detail, including that which clearly showed the sanitary needs of Chicago for the additional water, and concluded the opinion by stating:

" * * * a large part of the evidence is irrelevant and immaterial to the issues that we have to decide. Probably the dangers to which the City of Chicago will be subjected if the decree is carried out are exaggerated, but *in any event we are not at liberty to consider them here as against the edict of a paramount power.*" (emphasis supplied) Id., at p. 432, 45 S.Ct. at p. 181.

Maryland argues that Chicago did not need the water for an "essential state function," but I conclude it difficult to think of something more essentially sovereign or necessary to the welfare of the State and its people than sewage disposal; sewage disposal is as much a part of public health as hospitals for contagious diseases, and hospitals for the mentally ill. Yet, the Court stated in this context that when Congress exercised its power over interstate and foreign commerce, the welfare or needs of the inhabitants of the State *could not even be considered.* Maryland also argues that the case is distinguishable because it concerned a direct burden on commerce. The answer is that Congress has found that substandard wages and nonpayment of overtime are also burdens on commerce and this finding has been judicially approved. United States v. Darby, supra.

Board of Trustees of University of Illinois v. United States, supra, was a case in which the alleged conflict between the exercise of the power of Congress to regulate commerce and the concept of state sovereignty arose where the State was exercising its sovereignty to provide higher education. The University of Illinois imported scientific apparatus for use in one of its educational departments, and it sued to obtain a refund of duties exacted on the importations. For a unanimous Court, Chief Justice Hughes held that the power of the federal government over goods moving in foreign commerce is plenary, that the State in the performance of state functions might not limit the exercise by Congress of its power, and that the duties were properly laid.

In arriving at this result, the Court recognized that the federal government has the power to tax, including the power to lay duties, and that it has the power to regulate commerce. The existence of the taxing power was stated not to foreclose Congress from laying duties in the exercise of its power to regulate commerce, and the Court concluded that the duties in question were laid in the exercise of the power to regulate commerce and not in the exercise of the taxing power. Having reached that conclusion, the Court then dealt with the argument that in the exercise of the commerce power, Congress was limited by notions of state sovereignty as it was when it exercised its taxing power:

"The principle invoked by the petitioner, of the immunity of state instrumentalities from federal taxation, has its inherent limitations. * * * It is a principle implied from the necessity of maintaining our dual system of government. * * * Springing from that necessity it does not extend beyond it. Protecting the functions of government in its proper province, the implication ceases when the boundary of that province is reached. The fact that the state in the performance of state functions may use imported articles does not mean that the importation is a function of the state government independent of federal power. The control of importation does not rest with the state but with the Congress. *In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power. There is thus no violation of the principle which petitioner invokes, for there is no encroachment on the power of the state as none exists with respect to the subject over which the federal power has been exerted.* To permit the states and their instrumentalities to import commodities for their own use, regardless of the requirements imposed by the Congress, would undermine, if not destroy, the single control which it was one of the dominant purposes of the Constitution to create. *It is for the Congress to decide to what extent, if at all, the states and their instrumentalities shall be relieved of the payment of duties on imported articles."* (emphasis supplied) Id., 289 U.S. at p. 59, 53 S.Ct. at p. 510. Significant also for the case at bar, is the earlier statement of the Court in which it described the power of Congress over interstate and foreign commerce:

"It is an essential attribute of the power that it is exclusive and plenary. As an exclusive power, its exercise may not be limited, qualified, or impeded to any extent by state action. * * *

"* * * *The principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce."* (emphasis supplied) Id., at pp. 56–57, 53 S.Ct. at p. 509.

Maryland seeks to escape the language in this opinion by the apparent argument that the case involved Congress' power over foreign commerce and the express argument that the power of Congress over commerce would not be limited if recognition were given to state sovereignty over public schools and hospitals. Of course, the Court was writing in the field of foreign commerce, but the power of Congress over foreign commerce is no more plenary and no more exclusive than its power over commerce between the states, the latter including the power to regulate local activities which have a substantial effect on interstate commerce. Wickard v. Filburn, supra. The States lack any power to regulate commerce as such; it follows that there can be no interference with state sovereignty over interstate commerce because none exists. Where Congress had extended the Act to certain employees of public schools and hospitals, to hold that Congress may not validly do so necessarily limits the power of Congress. The opinion's specific and peremptory rejection of the assertion that "state functions" can isolate a state or its instrumentalities from federal regulation surely goes a long way to support the validity of the 1966 Amendments. The specific and peremptory rejection of the argument that the principle of duality in our system of government may limit in any way the authority of Congress to regulate commerce is dispositive of the present case.

Case v. Bowles, supra, only repeats the clear implications of the *Sanitary District* and *Board of Trustees* cases. In *Case,* a suit for injunction was brought to restrain the State of Washington from selling timber on school lands at prices in excess of those fixed by regulation adopted under the Emergency Price Control Act. The State alleged, in defense

of the action, that price controls could not be applied to it because the sale was "for the purpose of gaining revenue to carry out an essential governmental function—the education of its citizens." Id., 327 U.S. at p. 101, 66 S.Ct. at p. 443.

This argument was rejected and price controls held applicable to the State in the following language:

"We now turn to petitioner's Constitutional contention. Though as we have pointed out petitioners have alleged that the Act applied to setting a maximum price for school-land timber violates the Fifth and Tenth Amendments, the argument here seems to spring from implications of the Tenth Amendment only. *The contention rests on the premise that there is a 'doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.'* It is not contended, and could not be under our prior decisions, that the ceiling price fixed by the Administrator is Constitutionally invalid as applied to privately owned timber. * * * Nor is it denied that the Administrator could have fixed ceiling prices if the state had engaged in a sales business 'having the incidents of similar enterprises usually prosecuted for private gain.' * * * But it is argued that the Act cannot be applied to this sale because it was 'for the purpose of gaining revenue to carry out an essential governmental function—the education of its citizens.' Since the Emergency Price Control Act has been sustained as a Congressional exercise of the war power, *the petitioners' argument is that the extent of that power as applied to state functions depends on whether these are 'essential' to the state government. The use of the same criterion in measuring the Constitutional power of Congress to tax has proved to be unworkable, and we reject it as a guide in the field here involved."* (footnote eliminated; emphasis supplied) Id., at p. 101, 66 S.Ct. at p. 443.

\*   \*   \*   \*   \*   \*

"Where as here, Congress has enacted legislation authorized by its granted powers, and where at the same time, a state has a conflicting law which but for the Congressional Act would be valid, the Constitution marks the course for courts to follow. Article VI provides that 'This Constitution and the Laws of the United States * * * made in pursuance thereof * * * shall be the supreme Law of the Land * * *.'" (footnote eliminated) Id., at pp. 102–103, 66 S.Ct. at p. 443.

Case v. Bowles may not be summarily rejected, as it is by Maryland, on the ground that "the real sovereignty of the State was not infringed" and the case arose under the war power of Congress. The power of Congress to regulate commerce is no less plenary and no less exclusive than the power to make war under which the Emergency Price Control Act was adopted. While price limitation on the sale of timber to support public education, in degree, might be less discommoding than fixing wages of certain state employees, the Court's rejection of the "essential" functions argument is of extreme significance; the rejection goes to the very heart of this case.

The line of cases beginning with United States v. State of California, supra, may appear to be distinguishable from the instant case on the ground that each involved state activities which do not fall within the concept of essential governmental functions. Yet the essential nature of the state activity and the sovereignty of the state was interposed as a defense in each of them and rejected by the Court, not on the ground that the activity was not essential but on the ground that the "essential" concept was not a good defense. Thus, the cases are additional authority for concluding that the States' argument here is lacking in merit.

In United States v. State of California the question was whether a terminal railroad owned and operated by a State for the purpose of facilitating the commerce of a port, all of the revenues of which were used to improve port facilities, could be subjected to the Federal Safety Appliance Act, so that the penalty prescribed by that Act for its violation could be recovered from the State of California.[19]

California urged these activities were not subject to the Act because " * * * it is said that as the state is operating the railroad without profit, for the purpose of facilitating the commerce of the port, and is using the net proceeds of operation for harbor improvement * * * it is engaged in performing a public function in its sovereign capacity and for that reason cannot constitutionally be subjected to the provisions of the federal act." Id., 297 U.S. at p. 183, 56 S.Ct. at p. 423. Mr. Justice Stone (later Chief Justice), speaking for a unanimous Court, specifically rejected this argument and sustained the imposition of the penalty, stating:

" * * * we think it unimportant to say whether the state conducts its railroad in its 'sovereign' or in its 'private' capacity. That in operating its railroad it is acting within a power reserved to the states cannot be doubted. * * * The only question we need consider is whether the exercise of that power, in whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. * * * In each case the power of the state is subordinate to the constitutional exercise of the granted federal power." Id., at pp. 183–184, 56 S.Ct. at p. 424.

In addition to announcing the absolute supremacy of the power of Congress to exercise its authority to regulate commerce despite the defense of state sovereignty, the Court rejected an argument that the commerce power is circumscribed by state sovereignty, as is the taxing power. It said:

"The analogy of the constitutional immunity of state instrumentalities from federal taxation, on which respondent relies, is not illuminating. That immunity is implied from the nature of our federal system and the relationship within it of state and national governments, and is equally a restriction on taxation by either of the instrumentalities of the other. Its nature requires that it be so construed as to allow to each government reasonable scope for its taxing power * * * which would be unduly curtailed if either by extending its activities could withdraw from the taxing power of the other subjects of taxation traditionally within it. * * * Hence we look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. *But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual.*" (emphasis supplied) Id., at pp. 184–185, 56 S.Ct. at p. 424.

In State of California v. United States, supra, an order of the United States Maritime Commission requiring elimination of preferential and unreasonable practices, i. e., excessive free time and non-compensatory charges for services, was held enforceable against the State

---

19. It is interesting that in an earlier suit, Sherman v. United States, 282 U.S. 25, 51 S.Ct. 41, 75 L.Ed. 143 (1930), involving the same belt railroad, Mr. Justice Holmes said: "California has not gone into business generally as a common carrier, but simply has constructed the Belt Line as an incident of its control of the harbor—a State prerogative." Id., at p. 29, 51 S.Ct. at p. 41.

of California and the Board of State Harbor Commissioners for San Francisco Harbor. California defended its noncompliance with the order on the ground that the Act under which it was issued had no application to public owners of wharves and piers. This question of statutory construction was decided against its contention, with the Court adding:

"* * * it is too late in the day to question the power of Congress under the Commerce Clause to regulate such an essential part of interstate and foreign trade as the activities and instrumentalities which were here authorized to be regulated by the Commission, whether they be the activities and instrumentalities of private persons or of public agencies." Id., 320 U.S. at p. 586, 64 S.Ct. at p. 357.

The belt railway which was the subject of litigation in United States v. State of California, supra, was also the subject of litigation in State of California v. Taylor, supra. In the latter the question was whether the Railway Labor Act was applicable to the *employer-employee relationship* between the State of California and its employees engaged in operating the railroad. Notwithstanding that California provided that its employees had no right to bargain collectively with it concerning terms and conditions of employment, the Railway Labor Act was held applicable on the principle that a state may not prohibit the exercise of rights which the federal labor relations acts protect. As in the earlier cases, California asserted the Act, if held to apply to it, invalidly interfered with its sovereign immunity, but the Court rejected this contention, saying:

"Finally, the State suggests that Congress has no constitutional power to interfere with the 'sovereign right' of a State to control its employment relationships on a state-owned railroad engaged in interstate commerce. In United States v. California (US) supra, this Court said that the State, although acting in its sovereign capacity in operating this Belt Railroad, necessarily so acted 'in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government.' 297 U.S. at page 184 [56 S.Ct. at page 424]. 'California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers * * *.' Id., 297 U.S. at page 185 [56 S.Ct. at page 424]. That principle is no less applicable here. If California, by engaging in interstate commerce by rail, subjects itself to the commerce power so that Congress can make it conform to federal safety requirements, it also has subjected itself to that power so that Congress can regulate its employment relationships." Id., 353 U.S. at p. 568, 77 S.Ct. at p. 1045.

A similar result was reached in Parden v. Terminal Ry. of Alabama State Docks Dept., supra, where Alabama's plea of sovereign immunity was rejected in a suit brought against it under the Federal Employers' Liability Act by an employee of a railroad which it owned and operated. The decision proceeded on the dual grounds that when Congress was empowered to regulate commerce, the States necessarily lost any portion of their sovereignty that would stand in the way, and that Alabama waived its protection against suit by an individual, as embodied in the Eleventh Amendment, by operating an interstate railroad approximately twenty years after enactment of the Federal Employers' Liability Act.[20]

20. Three decisions of United States Courts of Appeals in this area are worthy of note. United States v. Feaster, 330 F.2d 671 (5 Cir. 1964), held that the National Mediation Board, acting under the Railway Labor Act, could require the state agency which operated state-owned dock facilities to produce its employment records for inspection by a union. In State of Colorado v. United States, 219 F.2d 474 (10 Cir. 1954), it was held that the Colorado State Board of Stock Inspection

In United States v. Ohio, supra, the question was whether the State of Ohio was liable to the United States for penalties under the Agricultural Adjustment Act of 1938 for growing wheat on state-owned farms in excess of federally-imposed acreage allotments. Specifically, the wheat was grown on a prison farm as part of a program of individual therapy and rehabilitation. It was consumed exclusively on the farm; indeed, by the Ohio Constitution it could neither be "sold, farmed out, contracted or given away." The Sixth Circuit Court of Appeals held that the growing of wheat and consumption of the crop by the inmates of the institution could not have any substantial effect on interstate commerce and, hence, that the Act was inapplicable. 354 F.2d 549 (1965). The judgment was summarily reversed in a per curiam opinion on the authority of Wickard v. Filburn, supra.

The *Ohio* case had present all of the factors relied on here by the States to invalidate the 1966 Amendments. Nothing could be a more essential or a more sovereign governmental function than providing places of detention for those convicted of crimes. The performance of such a state function neither produces income nor competes with any private enterprise. Likewise, it is a function which can in no way be provided by private enterprise. The case was decided by the Court of Appeals on the commerce issue without reaching the asserted issue of impairment of state sovereignty and we are advised that in the briefs presented to the Supreme Court the latter contention was not made. While the case is conclusive authority for determination of the scope of the power of Congress to regulate commerce, it is not necessarily determinative on the issue of impairment of state sovereignty.

In asserting boundaries to federal regulation under the Commerce Clause, the States claim support for the result they advocate in New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), and other cases which have held the power of Congress to tax is subject to limitation. It should be noted at the outset that in the *New York* case there was no opinion of the Court, and reliance is placed upon one of the opinions concurred in by only four justices. But the weakness of this authority lies not in the lack of unanimity of the Court, but rather in the fact that other decisions before and after *New York* establish that an unqualified analogy between the taxing power and the commerce power cannot be made. Parenthetically, it should also be noted that in *New York* the claim of state sovereignty was rejected and the validity of the tax upheld. The *Sanitary District* case, supra, decided in 1925, and Board of Trustees of University of Illinois v. United States, decided in 1933, clearly imply that Congress's power to regulate commerce and Congress's power to tax are not coterminus. Case v. Bowles, decided the same term as, but after, New York v. United States, specifically rejects limitations on the war power such as were suggested on the taxing power by dictum in some of the opinions in the *New York* case. On the other hand, when the power of Congress to regulate commerce is being considered, United States v. State of California, decided ten years before the *New York* case, is specific in saying that the test of validity of regulation under the Commerce Clause is different from the test of the validity of federal taxation touching upon state sovereignty. See also, United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953).

---

was subject to the registration requirements of the Packers and Stockyards Act, and to the payment of penalties under the Act, "the same as are private persons or agencies," notwithstanding that inspection was conducted "in its sovereign capacity as a state." Id., at p. 477. The most recent decision in this regard is

N.L.R.B. v. Local 254, Building Service Employees International Union, AFL-CIO, 376 F.2d 131 (1 Cir. 1967), holding that for purposes of the National Labor Relations Act the Department of Education of the State of Massachusetts was "a person engaged in commerce" and "an employer" as defined in the Act.

These cases demonstrate that the taxing power and the commerce power have been viewed by the Supreme Court as having different limitations, because of the concurrent nature of the former, and the plenary nature of the latter. In sharp contrast, stand the statements of the Court that the power of Congress over war and over commerce, both foreign and interstate, are plenary. Because each is plenary, the war and commerce powers of Congress are necessarily coterminous, and Hopkins Federal Savings & Loan Ass'n v. Cleary, 296 U.S. 315, 343, 56 S.Ct. 235, 80 L.Ed. 251 (1935), so suggests. Thus, cases decided under any of the plenary powers are precedents for similar situations arising under one of the other plenary powers, while cases decided under the taxing power are weak authority for determining the limits of the exercise of a plenary power. While an attempt is made to distinguish Case v. Bowles on the ground that it concerned the war power, and to distinguish the *Board of Trustees* case on the ground that it concerned the power to regulate foreign commerce, patently, these powers are plenary, coterminous and indistinguishable from the power to regulate interstate commerce. Indeed, while asserting that the cases are distinguishable, the States fail to cite one case holding that these powers are not equally plenary and coterminous; at the same time, the States fail to cite one case holding that the commerce power is restricted to the same area as the taxing power.

Hopkins Federal Savings & Loan Ass'n v. Cleary, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251 (1935), urged on the Court by the States, should also be noticed. In the *Hopkins* case, a federal statute which permitted state building and loan associations to become federal building and loan associations without state consent was held invalid. The Congressional power under which the statute had been adopted was deemed by the Court to be concurrent with a similar state power. As a consequence, the Court, consonant with its approach in taxing cases, where *concurrent* powers were also involved, drew a line between federal and state sovereignty in holding that the statute unconstitutionally transgressed state sovereignty, but in doing so, it was careful to state: *"We are not concerned at this time with the applicable rule in situations where the central government is at liberty (as it is under the commerce clause when such a purpose is disclosed) to exercise a power that is exclusive as well as paramount."* (emphasis supplied) Id., at p. 338, 56 S.Ct. at p. 241. Thus, not only does the *Hopkins* case *not* constitute authority for the contention urged by the States, but the care with which the Court delineated the problem before it strongly suggests a contrary result had the legislation been an exercise of the power of Congress to regulate commerce. It is at most additional authority for the result I would reach.

The States, in the stipulations which we earlier mentioned, have presented extensive evidence to show the far-reaching financial impact on them of the 1966 Amendments. The proof tends to show that the graduated financial burden, resulting from escalation of the minimum wage and contraction of maximum hours without payment of overtime over a period of years, will necessitate either increased taxes or a curtailment of essential services. There is before us evidence that current budgetary appropriations will be insufficient to meet the increased costs resulting from the 1966 Amendments during the current fiscal period, and that in many instances, political subdivisions, restricted by organic law to maximum limits of taxation and borrowing, are currently operating at these maxima so that, absent grants-in-aid or an amendment of organic law, they will be required to curtail the amounts spent for teachers, text books and the like, or reduce the number of people served, if they are required to comply with the 1966 Amendments.

As I said earlier, this data is not excluded on evidentiary principles. It is properly before us—if only to put flesh

on the skeletal frame of this litigation. But, in the decision of the constitutional issues presented to us, it, and the arguments of unconstitutional impairment of state sovereignty predicated upon it, are largely irrelevant. I have concluded that the 1966 Amendments are valid and constitutional, as is the enterprise concept of the 1961 Amendments, and that there is no unconstitutional impairment of the sovereignty of the plaintiff States. The financial impact of the 1966 Amendments on the States is an argument to be addressed to Congress and not to the courts. As Chief Justice Marshall authoritatively stated in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824):

"If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. *The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at election, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments."* (emphasis supplied) Id., at p. 197.[21]

Even more specific in stating the principle that the financial impact of the

1966 Amendments is no guide to their validity is State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). In that case, the federal government planned to flood certain lands belonging to Oklahoma. The state sought an injunction, arguing, *inter alia,* that the project as planned would take much land unnecessarily, without serving the purpose of the dam. The Court declared:

"Such matters raise not constitutional issues but questions of policy. They relate to the wisdom, need, and effectiveness of a particular project. They are therefore questions for the Congress not the courts. \* \* \* *Nor is it for us to determine whether the resulting benefits to commerce as a result of this particular exercise by Congress of the commerce power outweigh the costs of the undertaking."* (emphasis supplied) Id., at pp. 527–528, 61 S.Ct. at p. 1060.

To a further allegation that tax revenues of Oklahoma would be diminished because of loss of property taxes on the seized land, and that public education might be hampered because certain school buildings, on the condemned land, would have to be rebuilt elsewhere, the Court said:

*"The possible adverse effect on the tax revenues of Oklahoma as a result of the exercise by the federal government of its power of eminent domain is no barrier to the exercise of that power."* (emphasis supplied) Id., at p. 534, 61 S.Ct. at p. 1064.[22]

21. The vitality of the principle announced has not been eroded by time. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 255, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Polish National Alliance, Inc. v. N.L.R.B., 322 U.S. 643, 650, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944); State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 527–528, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); Sanitary District of Chicago v. United States, 266 U.S. 405, 432, 45 S.Ct. 176, 69 L.Ed. 352 (1925).

22. Although not as explicit, several of the authorities discussed in the text support the rule that when the commerce power is exercised the test of validity of the exercise is *not* the cost to the States. In State of California v. Taylor, supra, the State was exposed to payment of the higher wages for state employees arrived at as a result of collective bargaining rather than the scale prescribed by state fiat. The result of the decision in United States v. Ohio, supra, would be presumably to increase the state's cost for

■ I conclude that defendants' motion for summary judgment should be granted, but in view of the fact that my conclusions are shared only in part by Chief Judge Thomsen, and not at all by Judge Northrop, counsel may present a form of decree declaring the minimum wage provisions of the 1966 Amendments valid and constitutional and denying plaintiffs' prayers for injunctive relief.

THOMSEN, Chief Judge (concurring in part):

I agree with the conclusion reached by Judge Winter—that the injunction requested by plaintiffs should be denied—but for somewhat different reasons and with one important reservation. I agree that the operation of schools and hospitals by the several States and their subdivisions affects interstate commerce to a substantial degree, whether or not such operations themselves constitute interstate commerce, and that use of the "enterprise concept" does not itself render unconstitutional the 1966 Amendments to the Fair Labor Standards Act. The potential Eleventh Amendment problems, suggested by the States, should be considered as they may arise in subsequent actions against the several States. But I cannot agree that the power of the federal government to regulate essential sovereign functions of the States is absolute and unqualified, despite the broad language of the opinions cited by Judge Winter.

When the thirteen sovereign States adopted the Constitution they gave up only part of their sovereignty to the United States of America. The system created by the Constitution was and is a federal system; the States are not administrative divisions of a central government. For reasons which were reviewed by Judge Wisdom in United States v. Manning, W.D.La., 215 F.Supp. 272 (1963), and are not disputed, the Tenth Amendment was adopted in 1791. To characterize that Amendment as a "truism" does not mean that it was intended to be devoid of meaning, lulling the States into acceptance of a national government which may, without further amendment to the Constitution, take away from the States the substance, if not the trappings, of the sovereignty which they intended to preserve. The Tenth Amendment makes explicit the principle of federalism, which recognizes the supremacy of the federal government with respect to the powers delegated to it, but also recognizes that the States retained certain sovereign powers. The sovereign powers retained by the States are not specified in the Tenth Amendment or in any other provisions of the Constitution; they are limited only by the scope and thrust of the powers delegated to the federal government.

The power to regulate interstate commerce delegated to the federal government has been held to be "plenary" and has been accorded a very wide range by the Supreme Court. The cases in which the extent of the commerce power has been discussed in relation to the Tenth Amendment fall into two categories: those in which the regulation was being applied to and challenged by a party other than a State or a political subdivision, and those in which the regulation was being applied to and challenged by a State itself or by a political subdivision of a State.

In the first category, the pendulum has swung away from decisions [1] which

wheat and flour supplies purchased from the market place rather than grown on the prison farm. In Case v. Bowles, supra, price controls on the sale of timber decreased school revenues so that services would have to be reduced or school taxes increased. The penalties exacted in United States v. Ohio, supra, and United States v. State of California, supra, represented a diminution of general state revenues otherwise available to support other state activities.

1. Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918); Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); and Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).

restricted the commerce power. Since 1937 the Supreme Court has consistently held that the federal regulatory power under the commerce clause may control intrastate activities which merely affect commerce.[2]

The cases involving federal regulation of activities engaged in by the States or their subdivisions have been analyzed in Judge Winter's opinion. Some of them involved the competing interests of several States,[3] the treaty power,[4] the power over foreign commerce,[5] or the war power.[6] Others involved the operation by a State of a railroad,[7] a waterfront terminal[8] or the dominion which the federal government has, "to the exclusion of the States," over navigable waters of the United States.[9] The opinions in some of those cases state the power of the federal government over interstate commerce in broad and unqualified terms, indicating that when Congress exercises its power over interstate commerce, the welfare or needs of the States need not even be considered. The broad language of the opinions must, however, be read in the context of the cases in which they were rendered. In none of those cases were the essential taxing and budgetary functions of the States so seriously affected as they are by the statute under consideration. We

must heed the admonition in Gomillion v. Lightfoot, 364 U.S. 339, at 343–344, 81 S.Ct. 125, at 128, 5 L.Ed.2d 110: "Particularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretative process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts."

The question remains: Does the principle of federalism, implicit in the Constitution as originally drawn, and made explicit by the Tenth Amendment, prevent Congress from regulating, in the manner provided by the 1966 Amendments, the operation of public schools and hospitals by the States and their subdivisions?

The States cite a number of cases arising under the taxing power, to the effect that the taxing power is subject to limitations imposed by the principle of federalism, and argue that similar limitations apply to the commerce power. Limitations on the taxing power have been recognized when the exercise of that power would unduly interfere with the governmental activities of the States.[10] "This principle is implied from

2. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); N.L. R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); see also Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

3. Sanitary District of Chicago v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L. Ed. 352 (1925); United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

4. Sanitary District of Chicago v. United States, supra.

5. Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933).

6. Case v. Bowles, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946).

7. United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); State of California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957); see also Parden v. Terminal Ry. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

8. State of California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944).

9. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941).

10. Graves v. People of State of New York ex rel. O'Keefe, 306 U.S. 466, 477, 478, 59 S.Ct. 595, 83 L.Ed. 927 (1939).

the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system." Indian Motocycle Co. v. United States, 283 U.S. 570, 575, 51 S.Ct. 601, 603, 75 L.Ed. 1277 (1931).[11] The States argue that the reach of the commerce power is no greater than the reach of the taxing power, citing a statement from one of the opinions in New York v. United States, 326 U.S. 572, 582, 66 S.Ct. 310, 314, 90 L.Ed. 326 (1946): "Surely the power of Congress to lay taxes has impliedly no less a reach than the power of Congress to regulate commerce." It must be recognized, however, that a limitation has been placed upon the taxing power which has not yet been placed upon the commerce power.

In another opinion in New York v. United States, Chief Justice Stone, concurring for himself and three other Justices, stated:

"* * * we are not prepared to say that the national government may constitutionally lay a non-discriminatory tax on every class of property and activities of States and individuals alike. * * * [A] federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government. * * *" 326 U.S. at 586–587, 66 S.Ct. at 316.

"The problem is not one to be solved by a formula, but we may look to the structure of the Constitution as our guide to decision. * * *" 326 U.S. at 589, 66 S.Ct. at 317.

The limitation on the taxing power—undue interference with a State's performance of its sovereign functions of government—responds to Chief Justice Marshall's famous dictum: "The power to tax involves the power to destroy".

M'Culloch v. State of Maryland, 4 Wheat. 316, 431, 4 L.Ed. 579 (1819). The potentially destructive power of taxation lies in the ability of one sovereign to impose an economic burden upon the functions of the other too great to be borne, thereby curtailing or eliminating a particular activity.

Taxation is not the only way in which the federal government may destroy or cripple essential State functions. There must be some limit beyond which the federal government cannot go in its attempt to exercise against the States themselves the power of the federal government over interstate commerce. Neither the Solicitor of Labor, who argued the case for all the defendants, nor Judge Winter in his opinion, denies that there may be some limit, but they argue and hold respectively that whatever limit there may be has not been exceeded in this case.

The proper limit is indicated, though not fixed, by the statement of Chief Justice Stone, quoted above, that "a federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government." The attempted exercise against a State of the power of the federal government over interstate commerce should face the test: does it interfere unduly with the State's performance of its sovereign *and indispensable* functions of government? If the concept of federalism is to survive, it must stand on constitutional limitations, not on the sufferance of the federal government.

When the federal government invokes the commerce power, unaided by the Fourteenth Amendment or any other constitutional provision, to regulate the relations between a State and state employees who are not themselves engaged in interstate commerce or in the production of goods for commerce, the Court

---

11. See also New York v. United States, 326 U.S. 572, 577, 66 S.Ct. 310 (1946); Willcuts v. Bunn, 282 U.S. 216, 51 S.Ct. 125, 75 L.Ed. 304 (1931).

should consider a number of factors in determining the constitutionality of the proposed regulation. The Court should give weight and deference to any congressional findings with regard to the effect which the action sought to be regulated has on interstate commerce. The Court should also consider whether the activity subject to the proposed regulation is an important function of the State and its political subdivisions; whether the service in question is offered or might be offered to the same extent and on substantially the same terms by private enterprise or other non-state sources; and whether such regulation would seriously interfere with the State's performance or regulation of its indispensable sovereign functions.

The statute enacting the 1966 Amendments contains no congressional findings with respect to the relationship between interstate commerce and the proposed coverage of state employees.[12]

The operation of public schools and hospitals is undoubtedly one of the most important functions of State governments. The Supreme Court in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), stated flatly: "Today, education is perhaps the most important function of state and local governments." The importance of public hospitals to the community is also beyond dispute.

Public hospitals in many instances provide service otherwise unavailable.[13] The public schools and hospitals could not be replaced by nongovernmental enterprises.[14] The alternative would be federal schools and hospitals, and no one has argued for that.

From the mass of evidence submitted to the Court pursuant to stipulation, it is clear that the impact of the 1966 Amendments on the States is far-reaching. The Act imposes upon the States a graduated financial burden, which will necessitate

12. Findings with respect to labor conditions in industries engaged in commerce or in the production of goods for commerce, were included in the original Fair Labor Standards Act, see 29 U.S.C.A. § 202(a).

13. In Maryland 867 beds, all publicly owned and operated, constitute the total facilities for tubercular care in the State of Maryland. A similar situation exists in Texas. Under Texas law, on the discovery of tuberculosis the patient can be committed to a state hospital until the disease is no longer communicable. But non-state hospital beds for tubercular patients are vitually non-existent and the few that are available are extremely expensive. Similarly, approximately 90% of the facilities for the mentally disturbed and mentally retarded in Maryland are provided by the State, and, undoubtedly, much the same proportion applies in other States. Moreover, it is the public hospital which bears the main burden of providing care for the indigent. In Texas, for example, most of the people in State mental institutions are charity or near charity patients. In the Texas tubercular hospitals only nine out of 2,900 patients paid for the complete cost of their hospital care in 1966. The necessity of keeping the mentally disturbed and those ill with com-

municable diseases away from the community at large is too obvious to require elaboration.

14. In Maryland approximately 80% of the total number of secondary and elementary school students are enrolled in public schools. In Texas and Ohio the comparable figures are approximately 86% and 84% respectively. The great majority of the other schools are either parochial or religiously affiliated. In Maryland public institutions of higher education served 74% of the students enrolled toward degree credit. In Texas and Ohio the comparable figures were 77% and 63% respectively. In 1965 over half the hospital beds in Maryland were located in hospitals operated by State and local governments. It is true, as defendants note, that these hospitals accounted for only 15% of the total admissions, but that figure reflects their role in treating the chronically ill and long-term mental and tubercular patients. In Texas, State hospital beds account for almost half the total number of beds in all Texas hospitals, and for about 25% of the admissions. State and local government hospitals in Ohio provided almost half the total number of hospital beds in the State and accounted for about 15% of the admissions.

either increased taxes or a curtailment of the services now being rendered by the States and their political subdivisions. Most of the States must operate out of current funds provided by budgetary appropriations,[15] and in many instances the responsible political subdivisions, notably school districts, are taxing at their constitutional maximum and would have to curtail the amounts spent for teachers, textbooks and the like, or reduce the number of people served, unless and until the State constitution is amended.

Nevertheless, I cannot say that the minimum wage provisions interfere so *unduly* with the States' performance of their indispensable sovereign functions as to make those provisions unconstitutional. It is of course true, as Judge Northrop points out, that the minimum wage provisions interfere with the budgetary function of the States. But that interference must be weighed against the interest of the federal government, representing all the people of the United States, in seeing that all the people are paid an appropriate minimum wage. Serious problems are presented by the possible application of the Act to work done by inmates of correctional and other institutions as part of their education or rehabilitation programs, but I agree with the Solicitor of Labor that these can best be handled by the regulations or on a case by case basis, and do not justify a sweeping injunction.

The overtime provisions present a more serious problem. Unlike the minimum wage provisions, the overtime provisions are not limited to the lowest paid employees. Many State functions, including some which are affected by the 1966 Amendments, require work arrangements other than the standard 40-hour work week. Public school, college and university personnel, who generally receive lengthy vacations, must often work longer than 40 hours per week during some part of the school year. The statute under consideration makes some provision in this regard for the employees of hospitals, whose round-the-clock requirements do not fit comfortably into a 40-hour work week.[16] A common practice has been to give these and other State employees compensatory time, or to make various other budgetary arrangements to keep in fair balance State jobs of the most diverse character. If the overtime provisions of the 1966 Amendments are valid, many of those arrangements may no longer be possible. The Act will seriously hamper the organizational and budgetary functions of the States by forcing them to favor employees of their hospitals and schools over other programs such as welfare and law enforcement, unless the States rearrange their entire civil service and appropriate additional sums for employees not covered by the Act.

For reasons stated above, I am satisfied that a line must be drawn, and that with respect to some if not all state employees covered by the 1966 Amendments the overtime requirements of the Act probably go beyond the permissible limits. The interference with the organizational and budgetary functions of the States has been noted. On the other hand, Congress has not stated, and neither the committee hearings nor the stipulated facts in this case show, what

15. Thus, Texas represents to the Court that in order to meet the standards of the Fair Labor Standards Act the expenditures of the Texas Youth Council will be increased by over $3,000,000 annually; the Department of Mental Health and Mental Retardation will need an additional $7,500,000 annually; the cost of the Institutions of Higher Education will go up over $3,250,000 annually and the Fort Worth Independent School District will need by 1971 to find additional tax revenue sources for approximately $575,-000 annually. Even though the Fort Worth District is one of the larger districts in the State, there are over 1,-300 other Independent School Districts whose cost will be increased proportionately and who also must find additional sources of revenue. Many of these districts have reached their constitutional tax rate limit as well as property value limitations.

16. 29 U.S.C.A. § 207(j) (1966 Cum. Supp.).

if any effect on interstate commerce the overtime practices of the several States may have. The issue in each instance is whether the particular regulation *unduly* interferes with one or more indispensable sovereign functions of the State. This indicates that the question whether the application of the overtime provisions of the statute to state employees goes beyond the permissible limits should be decided in the context of particular cases, when the extent of the interference with an indispensable state function can be weighed against the effect, if any, which the State's overtime practices have on interstate commerce.[17] I conclude that a sweeping injunction at this time would not be proper.

The denial of relief in this case should be without prejudice to the right of the several States and their political subdivisions to challenge the overtime provisions of the Act applicable to employees of the States and their political subdivisions, in future cases presenting specific situations.

NORTHROP, District Judge (dissenting).

I am compelled to dissent from the conclusions reached by Judge Winter and Judge Thomsen that this Act is not unconstitutional.

The majority recognizes that this is a case of first impression involving a conflict between Congress' power under the Commerce Clause and state sovereignty as recognized in our Constitution.

Judge Winter concludes that the power of Congress under the Commerce Clause has no boundaries and Congressional preemption in this field is supreme, it mattering not that it would destroy the constitutionally recognized sovereignty of the states. To put it simply, he holds that from the beginning federalism, as embodied in our Constitution, existed by the will of Congress rather than by the will of the people. No case has gone that far. It is supported neither by history nor by the structure of the Constitution.

In his concurring opinion, Judge Thomsen recognizes that there is implicit within the concept of federalism embodied in the Constitution a limitation on the power of Congress under the Commerce Clause. However, he feels that the minimum wage provisions of the Act as they affect the states do not transgress the limitation imposed by the Constitution upon Congress. But he expresses serious doubts as to the constitutionality of the overtime provision of the Act as it affects the states. Nevertheless he concludes that question is not yet ripe for adjudication. As to it, he would wait until the Department of Labor promulgates and applies its regulations to the states and decide constitutionality on a case-by-case basis.

Although I agree with Judge Thomsen's analysis of the pertinent cases and some of his reasoning as to the effect

17. At the hearing of this case the Solicitor of Labor argued for all of the defendants. He was asked from the Bench whether and where a line should be drawn. Without conceding that any line should be drawn in this case, and without withdrawing from his position that the plenary power of the federal government over interstate commerce applies to the States as well as to individuals, the Solicitor suggested: " * * * we have such a variety of situations that it may not be the path of wisdom to try to issue any blanket rule [to cover] the variety of different situations demonstrated [by the stipulations with respect to] Maryland, Ohio and Texas, and which can be assumed to exist in a multiplicity of cases throughout the fifty States."

Tr. p. 193. The Solicitor concluded "that this is not the appropriate place and case for blanket injunctions or orders on a blanket basis so far as the application of this rule to schools and hospitals are concerned. Instead, it would seem most appropriate if such a new line were conceived and fashioned, if it should be, that the concept and the fashioning of it should not be for this Court, but by the Supreme Court in any later proceedings, or perhaps, as I have suggested several times before, it should be done as cases actually come up in the future and action is taken where we can get a full exposure of all of the different facts and facets on issues that may well be presented at that future time." Tr. pp. 204, 205.

of the amendment on the states, I cannot agree with his conclusions. Unless the Department of Labor emasculates the Act, there will be no way for this or some other court to avoid the constitutional question posed herein.

The question before us is whether this Congressional exercise of power under the Commerce Clause constitutes an undue infringement upon the "performance of [the state's] function as a government which the Constitution recognizes as sovereign."

This quotation is from Chief Justice Stone's opinion in New York v. United States, 326 U.S. 572, at 588, 66 S.Ct. 310, at 317, in reference to the limits on the taxing power of Congress. Although it is recognized that the power under the Commerce Clause may be broader, it must have some limits. The language of Chief Justice Stone suggests such a limitation.

We are concerned here with the separation of powers between national and state government established by our Constitution. This concept of federalism has been carefully preserved throughout our history by the courts, not by exhorting the Congress on the one hand or the state legislatures on the other to restrain their actions so as not to trespass on the rights, responsibilities, and duties of the other.

I cannot agree that it is a political question for the state to importune the Congress not to raise the salaries of state employees, thus forcing the state legislature to tax its people to pay those employees. This is a direct transgression on the concept of federalism, which must be determined by the courts. The case before us is a perfect example of the wisdom of Constitutional rather than Congressional federalism. The amendment, through which the states are subjected to the Fair Labor Standards Act, was enacted without notice to the states so that they might be heard and without any thought being given to the effect of the Act on them. Surely the statement of one Congressman, even in the committee of the whole, did not alert the states, or constitute a Congressional finding, or give this Act a purpose as applied to the states as the majority would wish. [Note 10, Judge Winter's opinion.]

This case then brings into confrontation the powers of Congress under the Commerce Clause with the concept of dual sovereignty or federalism as embodied in our Constitution, which is articulated in the Tenth Amendment.

The effect of this Act must be measured against the Constitution precisely and its impact cannot be softened by what regulation a department of the national government might promulgate in its application.

What then is its effect on the state government?

By this Act Congress is forcing, under threat of civil liability and criminal penalties, the state legislature or the responsible political subdivision of the state

1. to increase taxes (an impossibility in some of the political subdivisions without a state constitutional amendment); or

2. to curtail the extent and calibre of services in the public hospitals and educational and related institutions of the state; or

3. to reduce indispensable services in other governmental activities to meet the budgets of those activities favored by the United States Congress; or

4. to refrain from entering new fields of governmental activity necessitated by changing social conditions.

The allocation of the state's revenue among government activities is the most important function of state government, for it determines the extent and calibre of service which a state can supply. State governments must provide services out of current tax funds. The state government and its political subdivisions are particularly sensitive to the needs of the people and their ability to pay for the indispensable governmental functions that must be furnished.

The budget is, therefore, under constant study by both the executive and legislative branches of the state's government. Not only does the appropriation bill demand the highest consideration of the legislature while it is in session, but it also requires most of the attention of the executive and the interim legislative committees between sessions.*

There is only so much revenue available. The wise allocation of this money demands this constant up-to-the-minute knowledge of state and local governmental officials intimately concerned with the requirements and priorities to be allotted among the health, welfare, education, law enforcement, urban, pollution, and other demanding governmental functions, each of substantial importance. The states' Congressional delegations neither have the time, nor knowledge, nor is it their function to become involved in the vital details of state fiscal policy.

Perhaps all of the above can be expressed more graphically by a recent news story in the Evening Sun (Baltimore) which undoubtedly is repeated hundreds of times across the nation:

"It is budget time again in Howard County * * *.

"What particularly worries the commissioners is that the school budget [the largest expenditure of the county government] has gone up on an average of 22 per cent each year while the taxable income goes up only 15 per cent and assessments only 9 per cent."

The Evening Sun (Baltimore), April 6, 1967.

The impact of a mandatory allocation of state-collected revenues by Congress among the indispensable state governmental services is thus readily demonstrated. It amounts to the national government compelling state government action and controlling and operating the state government with little or no knowledge of the requirements of its citizens or the financial ability of those citizens to pay the bill.

The Congress, under the theory of this Act, can manipulate state governments by increasing the state functions to come under the "enterprise" concept or removing exemptions for classes of state employees at will without notice to the state, and all at the expense of the state. This Act is thus an intrusion of first magnitude into the functioning of state government now, is potentially without limit, and carries with it the formula for the destruction of the concept of federalism.

Congress has heretofore carefully avoided interjecting the national power into state or local governmental functions. Although grants-in-aid and matching funds might have that effect, these have a contractual basis—a far cry from mandatory direction. This Congressional reluctance in and of itself indicates a recognition of the Constitutional principle of federalism.

The careful nurturing of the concept of federalism has come to fruition since World War II in the increasing initiative of the states in meeting new problems brought about by the great social changes in our nation. The momentous "Metropolitan Problem" has caused the creation of new forms of local government in many of the affected areas. The wisdom of local administration has been clearly demonstrated. We are seeing many more governmental activities being undertaken by the federal and state governments on a recognized partnership basis directed at solving our internal problems. In light of the above examples of voluntary movement toward national and state partnership, rather than compulsion, it would indeed be tragic at this point in his-

---

* For example, consider the reports of the Maryland General Assembly's Committee on Taxation and Fiscal Affairs from 1955 to date, the Maryland Legislative Council's Report for any year and countless other such documents reflecting the prodigious amount of time and effort put forth by state officials to supply governmental services. These documents may be found in the Archives of the Council of State Governments.

tory to expand and broaden the power of the federal government over the state governments in the exercise of their necessary governmental functions under the guise of the "Commerce Clause" to a poiint never heretofore reached by any decision. To substitute now the delayed and ponderous action of a remote central government would atrophy and stifle this progress.

Alexis de Tocqueville in his *Democracy in America* said it in this manner:

" * * * I cannot conceive that a nation can live and prosper without a powerful centralization of government. But I am of the opinion that a centralized administration is fit only to enervate the nations in which it exists, by incessantly diminishing their local spirit. Although such an administration can bring together at a given moment, on a given point, all the disposable resources of a people, it injures the renewal of those resources. It may insure a victory in the hour of strife, but it gradually relaxes the sinews of strength. It may help admirably the transient greatness of a man, but not the durable prosperity of a nation." Vol. I, pp. 86–87 (Bradley ed., New York, 1946).

Thus, the limitation upon a power, which has been delegated to the federal government—including the power to regulate commerce among the states—and which deals with the internal affairs of this nation, is reached when Congress exercises that power so as to interfere unduly in some manner with the state's performance of an indispensable governmental activity. The Act as applied to employees of public schools, hospitals, and related institutions is unconstitutional because it is an undue infringement upon the performance of an indispensable and fundamental governmental function (its taxing and budgetary function) of the state, which the Constitution recognizes as sovereign.

The proof of the wisdom of the federal concept is implicit in the name of our government—the "United States". It cannot be said more succinctly.